KATIE A. MOORSHEAD, Appellant, v. UNITED RAILWAYS COMPANY OF ST. LOUIS et al.

### In Banc, March 30, 1907.

1. **LEASE: Power of Named Lessee to Acquire.** By an ordinance of the city of St. Louis several railroad companies therein named, "and their successors and assigns, are hereby severally authorized to sell, convey, or lease, if found desirable, their property, rights, privileges and franchises now owned and held, or herein granted, respectively, to any of the said companies named in this section, or to the St. Louis Transit Company, its successors or assigns," and "the said company and its successors and assigns so acquiring such property, rights, privileges and franchises, is hereby authorized to acquire, hold and enjoy the same during the term of this ordinance." The United Railways Company was not one of the companies named, but it acquired by purchase all the properties of those named, including the railway on which plaintiff was injured, and undertook to lease all the properties so acquired to the Transit Company. *Held*, that ordinance authorized a lease to the Transit Company. The city had authorized the Transit Company to acquire said railway by lease, and if the original owner could grant the lease to that company, so could a lawful purchaser do so.

2. ———: ———: **Successors and Assigns.** The consent of the city to said lease is not dependent on the use of the words "successors and assigns" after the words "the Transit Company," but is to be found in the words of the ordinance which named the Transit Company itself as the lessee.

3. ———: **By One Railway Company to Another: Good Faith.** If an agreement by which one street railway company transferred all its properties, privileges and franchises to another, was not entered into in good faith and for the purpose declared, but to defeat its creditors or to enable its properties and fran-

chises to be held by such other for its benefit in a manner that would screen it from judgments and relieve it of responsibility, it will be held liable without regard to the contract. But such an issue would be for the jury unless the instrument itself, or facts in evidence, show the truth beyond dispute.

4. ——: ——: **Agent: Partners.** The United Railways Company of St. Louis by agreement transferred to the Transit Company not only the right to operate its railways for a period of forty years, but every franchise held by it except the franchise to be a corporation, all its property, real, personal and mixed, all income derived from its bonds and stocks, and the money it had on hand at the date of the agreement and what it might receive afterwards by the sale of unusable property; and besides binding itself to operate the railways, the Transit Company bound itself to do various acts, such as keeping them in repair, making extensions and improvements and meeting the interest on bonded obligations, and to pay to the other company for the possession and use of the property during the stated period, the payments to be made at regular intervals and bearing all the characteristics of a fixed rent charge; and the contract provided for the reversion of the property to the grantor at the end of the term, and for a re-entry if the grantee defaulted in the performance of its covenants during the term. *Held,* that by the agreement the United Railways Company did not constitute the Transit Company its agent, nor did the agreement make them partners, but it was a lease.

5. ——: ——: **Goods, Etc.** Goods, chattels and franchises may be leased as well as lands and tenements.

6. ——: ——: **Liability of Lessor for Lessee's Torts.** Where the statute gives a street railway company express power to lease all of its properties to another street railway company, as the statute of this State does, the lessor is not liable in damages for injuries to a passenger resulting from the negligence of the lessee, unless such liability is expressly reserved in the statute. [Distinguishing Markey v. Railroad, 185 Mo. 348.]

7. **STATUTES: Time of Taking Effect: Revision Session.: Lease.** A statute with an emergency clause, approved June 19, 1899, authorizing one street railway company to lease all its properties to another, went into effect at once, although it was printed in the Revised Statutes of 1899 as a new section.

8. ——: **Lease: Companies Already Organized.** The act of June 19, 1899, by section 15 conferred on any existing street railway company which filed with the Secretary of State its acceptance of the act and paid the required fees, the power to lease its properties.

9. ——: ——: ——: **Acceptance Shown.** Where plaintiff seeks to hold liable for her tortious injuries the street railway company which has leased its properties to another company, and for the purpose of fastening liability upon it introduces the lease in evidence, the burden is not on the company to show that it has filed with the Secretary of State its acceptance of the provisions of the act authorizing it to make the lease. In such case, in the absence of proof to the contrary, the presumption is that both companies have complied with the provisions of the statute.

10. **LEASE: To Railway Company: Torts: Liability of Lessor: Statute.** When the lease of the franchises and railways of one street railway company to another is authorized by statute, the leasing company remains liable to third persons for the torts of the lessee, if the statute so says; and where the lease is not authorized by statute, the lease does not relieve the lessor of its public duties and responsibilities, but the lessor remains liable for the torts of the lessee. But where the statute does authorize the lease, without any reservation in the act of liability on the part of the lessor to third parties, for the torts of the lessee, the lessor is not liable for those torts. And where the statute expressly authorizes one street railway company "to sell, lease or dispose of by any other lawful contract, to any other street railway company, its railroad rights, franchises, including the right to be a corporation, and all and singular its other properties of every character and description," the lessor is not liable for the lessee's negligent injury of a passenger in the operation of a street car, and the General Assembly did not intend that it should be. The right to dispose of its corporate franchise being given to the grantor, it necessarily follows that it was not to be held liable for the torts of the grantee; and that conclusion is inevitable where the lessor is given the right to dispose of all its properties.

11. ——: ——: ——: ——: **Public Policy.** The very highest policy of a State is its statutory law. But the question of the liability of the lessor for the torts of the lessee is not to be determined by public policy. It is not a question of public policy, but of legislative intention—of statutory construction.

12. ——: **To Irresponsible Company: Liability of Lessor for Lessee's Torts.** The mischief which it is supposed by some courts that would result if leasing railway companies are not held responsible for the torts of the lessee, namely, that leases to irresponsible companies would be made for the purpose of evading liability, is met in this State by two answers: first, if

that was the intention, on proof of the fact, the lease would be disregarded like any other fraudulent conveyance, and the lessor held responsible; and, second, our statutes require one-half of the capital stock of a street railway company to be subscribed and ten per cent of the subscription to be paid up in cash, and to that extent, at least, the lessees would have to start with assets.

13. ————: Incidents. One of the incidents of a lease, unless there are covenants to the contrary, is that if the demised property (lands or chattels) is turned over to the lessee in good condition, the lessor is not thereafter liable to third parties for damages resulting from the negligent use of the property by the lessee; and where the statute empowers the lessee to operate the demised street railway, unless the power of control is reserved by the lessor in the lease, the operation will be without any interference by the lessor, and that necessarily means that the lessor is not answerable to a passenger negligently injured on a street car operated by the lessee — the injury being due to the sudden starting of that car too quickly after the passenger had boarded the car and thereby throwing her down.

Transferred from St. Louis Court of Appeals.

AFFIRMED.

*R. P. & C. B. Williams* for appellant.

(1) A railroad corporation, without the express consent and authorization of the lawmaking power of the State, cannot make a lease of its property or franchises to another corporation, such a contract being *ultra vires* and void. As between the parties, such a contract is non-enforceable, and, as to the public, for torts committed in the use of the leased property the lessee is treated as the agent of the lessor, both being jointly liable. Railroad v. Brown, 17 Wall. 450; Railroad v. Railroad, 130 U. S. 1; Railroad v. Railroad, 118 U. S. 290; Thomas v. Railroad, 101 U. S. 71; Railroad v. Bridge Company, 131 U. S. 371; Hart v. Railroad, 209 Ill. 414; McCoy v. Railroad, 36 Mo. Mo. App. 445; Markey v. Railroad, 185 Mo. 348; 2 Elliott on Railroads, sec. 430; Dean v. Railroad, 97 S. W. 910. (2) Even though a legislative consent and

authorization be given to a railroad corporation to execute or to accept a lease, such legislative permission cannot have the effect of relieving the lessor from the performance of its duties and obligations to the public, but simply validates the lease as between the parties, and the lessor remains liable to the public for the negligent acts of the lessee, the same as before the lease, unless the enabling statute contains an express exemption from liability. Railroad v. Hart, 209 Ill. 414; Harden v. Railroad, 129 N. C. 354; Brown v. Railroad, 131 N. C. 445; Logan v. Railroad, 116 N. C. 940; Railroad v. Crane, 113 U. S. 424; Braslin v. Somerville, 145 Mass. 64; Quested v. Railroad, 127 Mass. 204; McCabe's Adm. v. Railroad, 112 Ky. 861; Singleton v. Railroad, 70 Ga. 464; Beach, Private Corporations, sec. 366; Chicago Union Traction Co. v. Stanford, 104 Ill. App. 99; Railroad v. Meech, 163 Ill. 305; Railroad v. Balkwill, 195 Ill. 535; Railroad v. Doan, 195 Ill. 168; Smith v. Railroad, 130 N. C. 344; Balsey v. Railroad, 119 Ill. 68; Tillet v. Railroad, 118 N. C. 1031; Chollette v. Railroad, 4 L. R. A. 135; Par v. Railroad, 43 S. C. 197; Bower v. Railroad, 42 Iowa 546; Lee v. Railroad, 116 Cal. 97; Bean v. Railroad, 63 Me. 295; Lakin v. Railroad, 13 Ore. 436; Nelson v. Railroad, 26 Vt. 721; Daniels v. Hart, 118 Mass. 534; Tackers v. Railroad, 71 Mich. 645; Nagle v. Railroad, 3 S. E. 369; Willard v. Railroad, 124 Fed. 196; Railroad v. Dunbar, 20 Ill. 623; Driscoll v. Railroad, 65 Conn. 230; Harmon v. Railroad, 28 S. C. 401; Hawkins v. Railroad, 119 Ga. 159; Phelps v. Steamboat Co., 131 N. C. 12; Pierce v. Railroad, 124 N. C. 83; 5 Thomp. Corp., sec. 5884; Whitney v. Railroad, 44 Me. 362; Stearns v. Railroad, 46 Me. 95; Hart v. Railroad, 33 S. C. 427; Bank v. Railroad, 25 S. C. 216; Railroad v. Morris, 68 Tex. 49; Cogswell v. Railroad, 5 Wash. 46; Munz v. Railroad, 64 L. R. A. 222; Aycock v. Railroad, 89 N. C. 330; Benton v. Railroad, 122 N. C. 1007; Railroad v. Ferguson, 9 Tex. Civ. App.

610; Railroad v. Allen, 39 S. W. 125; Railroad v. Ellett, 132 Ill. 660; 23 Am. and Eng. Ency. Law, 784; Railroad v. Owen, 75 S. W. 579; Railroad v. Culberson, 10 N. E. 706. (3) The instrument in question is not a lease, but it resembles more "a partnership, an operating contract," or a "trust arrangement." In either case the Transit Company would be held as the agent of the United Railways Company. The essential elements of a lease—a determinate estate given the lessee, and absolute and exclusive ownership in the lessee of the term—are wanting in this instrument. Galveston v. Davis, 4 Tex. Civ. App. 468; Driscoll v. Railroad, 65 Conn. 230; St. Joseph, etc., v. St. Louis, etc., 135 Mo. 173; Railroad v. Cox, 102 Fed. 825; Archer v. Terre Haute, 102 Ill. 493; United S. Rolling Stock v. Potter, 48 Iowa 56.

*George Safford, George H. Shields, Thomas T. Fauntleroy* and *Shepard Barclay* also for appellant.

(1) The document is not a lease. As to third persons it is a contract of agency or partnership, nothing more. We hold that, under the elemental principles of the law of partnership and of agency, this so-called "lease" (as to third persons) either made these companies partners or made the Transit Company an agent to operate the lines of railway for the benefit of the other company or of both the parties interested. Brownlee v. Allen, 21 Mo. 123; York, etc., Co. v. Winans, 17 How. 30; Galveston, etc., Co. v. Davis, 23 S. W. 301; Cin. & C. Co. v. Sleeper, 5 Ohio Dec. 196; L. & N. Co. v. Breeden, 64 S. W. 667; Jones v. Penn. Co., 19 D. C. 178; Driscoll v. Railroad, 65 Conn. 230; Railroad v. Bouknight, 70 Fed. 442; Slater v. Clark, 68 Ill. App. 433. (2) No municipal assent to the transfer in question is shown by the evidence. The ordinance fails to authorize a transfer of the franchise of the United Rail-

ways to the St. Louis Transit Company, as to that part of the Transit Company's line where the accident in suit took place, which was on Geyer avenue between Jefferson avenue and Ohio avenue. Const., art. 12, sec. 20. The municipal "assent" which the Constitution and the statute (R. S. 1899, sec. 1187) require is an assent to a definite and particular transfer. The assent must be express. It was held in a case directly in point that a franchise given by law to a certain company, "its successors and assigns," did not authorize a transfer so as to relieve of liability the lessor. Railroad v. Oregonian Co:, 130 U. S. 32; Briscoe v. Railroad, 40 Fed. 273. Ordinance 19738 purports to sanction a lease of the property and franchises of certain companies to the St. Louis Transit Company, "its successors and assigns;" but the United Railways was not named as one of the companies the lease of whose property was thereby sanctioned. The legislative authority needful to sustain a transfer of a franchise by lease affecting this class of property must, under our Constitution and statute (R. S. 1899, sec. 1187), be fairly clear and intelligible. It must be express authority. That authority is wanting here, as a reading of the ordinance demonstrates. No such authority will be implied. Thomas v. Railroad, 101 U. S. 71; Peoria, etc., Co. v. Lane, 83 Ill. 448. Another conclusive reason why ordinance No. 19738 cannot avail to prove municipal assent to the "lease" is that by the terms of its last section (10) it only applies to such companies as filed their "written acceptance" of all its conditions, within sixty days after the date (March 20, 1899) of approval of the ordinance. That limit of time has long since elapsed. and there is no evidence that either company availed itself of the benefits the ordinance tendered to the companies within its purview. So neither can now take advantage of its terms. (3) The supposed statutory authority to lease does not declare the lessor absolved thereby

from the duty imposed by its franchise to operate, hence lessor remains liable. Where the leasing of such property is expressly authorized by law, the lessor remains liable for the proper performance of its duty to operate the railroad carefully, unless the law which confers the authority to lease declares that such transfer by lease relieves the lessor of the obligation and liability arising from its franchise. "While there is some conflict of authority, we think the great weight supports this conclusion." McCabe v. Railroad, 112 Ky. 816; Harmon v. Railroad, 28 S. C. 404; Driscoll v. Railroad, 65 Conn. 254; Braslin v. Railroad, 145 Mass. 68; Logan v. Railroad, 116 N. C. 946. On the principles declared in the foregoing decisions, the terms of the lease are immaterial, for it is not pretended that there is any Missouri law which goes further than to authorize a lease of the street railway property. In the absence of such a law applying to these defendants, there is a clear liability of the lessor in such a case as that at bar, for the servants of the lessees would be the agents of the lessor (as declared in the first instruction of the court). Brown v. Railroad, 27 Mo. App. 400; Penn. Co. v. Ellett, 132 Ill. 654; West Chic. Co. v. Anderson, 200 Ill. 329; Anderson v. Railroad, 161 Mo. 422; McCoy v. Railroad, 36 Mo. App. 445; Price v. Barnard, 65 Mo. App. 699; Sinclair v. Railroad, 70 Mo. App. 588; Phelps v. Steamboat Co., 12 Am. Neg. Rep. 617, 42 S. E. 335. (4) The defendant companies have no statutory power to lease or to take a lease of such property; hence, the lessor remains liable for the operation of the lines. There is complete unanimity of authority to the effect that without legislative power to transfer such property by lease, a transfer of that sort leaves the lessor liable for negligent operation of the railroad by the lessee. 3 Wood's Railway Law, sec. 400; 2 Elliott, Railroads, sec. 469; 5 Thompson, Corps., sec. 5884; Brown v. Railroad, 27 Mo. App. 400. Both

the Transit Company and the United Railways Company are barren of any right to lease (or to receive a lease of) such property, because neither was organized since the enactment of article 3 of the General Corporation Law of 1899, conferring such power on companies of that sort. Nelson v. Railroad, 26 Vt. 717; Abbott v. Railroad, 80 N. Y. 30.

*Boyle & Priest, George W. Easley* and *Edward T. Miller* for respondents.

(1) The law of Missouri in force at the time of the execution of the lease authorized the lease. R. S. 1899, sec. 1187. (2) The lease shows compliance with this law by its recitals. The term of the lease was for forty years. The exclusive right to manage, use and operate the lines leased was granted by the lessor to the lessee. It must be borne in mind that the question we have under consideration is the negligence of a lessee who is in the entire possession and control of the operation of the property, and over which the lessor retains no control whatever. It must also be kept in view that the nature and character of the act producing the alleged injury has everything to do with determining the liability of the lessor. (3) We can best serve the court by classifying the cases cited for appellant, and eliminating such as deal with other questions than the operation of the road. The first class of cases to be eliminated is that in which the lease was held invalid because there was no statutory authority to execute the same. All the cases cited in point one of appellant's brief are cases of this character, where, for want of statutory authority to execute the lease, the same was held void. It is clear that such cases can have no application to the case at bar, because the statute authorizes the execution of the lease, so that cases of the character cited in point one must be eliminated from

consideration of this question. (4) Many cases cited
for appellant in point two must also be eliminated, be-
cause there was no statutory authority for the execu-
tion of the lease. Chollette v. Railroad, 4 L. R. A. 135;
Munz v. Railroad, 64 L. R. A. 222; Railroad v. Crane,
113 U. S. 424, must be left out of the consideration
of this question, because the owner of the railroad owed
the duty of operating a part of its line which had been
abandoned without legislative right to do so. (5) All
that class of cases cited in point three of appellant's
brief must be eliminated from consideration of this
court, because the lessor is made liable by statute.
Smith v. Railroad, 61 Mo. 17; Anderson v. Railroad,
161 Mo. 411; Maine v. Railroad, 18 Mo. App. 388;
Brown v. Railroad, 27 Mo. App. 394; McCoy v. Rail-
road, 36 Mo. App. 445. (6) Such cases as Quested
v. Railroad, 127 Mass. 204, and Daniels v. Hart, 118
Mass. 534, must also be eliminated, because the very
act authorizing the lease expressly provided that the
lessor should remain liable for the acts of the lessee,
notwithstanding the lease. There is nothing of that
kind in the street car act of Missouri. Cases like Lee
v. Railroad, 116 Cal. 97, must be eliminated from the
consideration of this question, because there the liabil-
ity arose from the lessor's failure to properly construct
and maintain its road, which of course is an absolute
duty attaching to the owner, as it does to all landlords.
So of the case of Bower v. Railroad, 42 Iowa 546. It
must be eliminated because the liability was fixed by
statute. (7) To sustain the contentions, appellant's
counsel has thrown together a great mass of cases,
without attempting to in any manner classify them or
in anywise show the particular ground upon which
any of the cases rest. For instance, appellant's coun-
sel cites 1 Beach on Corporations, sec. 366. Yet, if he
had examined that section, he would have found that
it applied to that character of liability which was im-

posed by law upon the owner of the property, like
fencing, or some other duty imposed by statute, when,
had the learned counsel read the very next section, he
would have seen that he adopts the opinion of Judge
BREWER, in St. Louis Company v. Curl, 28 Kan. 622.
Counsel then cites a number of Illinois cases. When
they are examined, it will be found that they are all
based upon the early case of Railroad Company v.
Dunbar, 20 Ill. 623, and that that case was decided
upon the express ground that there was no legislative
authority to lease, and, in the earlier cases following
that, no distinction between legislative power to lease
and the want of it was made or has ever been enforced.
The Illinois court has simply failed to make that dis-
tinction, and holds to it, regardless of both principle
and reason. 3 Thompson on Corporations, sec. 588.
Even the Illinois courts have recently begun to distin-
guish between mere operation of the road and charter
duties. Railroad v. Eickman, 47 Ill. App. 156. He
then refers to the Georgia cases, and especially the
case of Singleton v. Railroad, 70 Ga. 464. A very
reputable author has said of this case that it "does
not seem to accord with sound principle or authority
upon this point." Mr. Freeman's note, 71 Am. Dec.
297. He also cites a line of Massachusetts cases, of
which Quested v. Railroad, 127 Mass. 204, is a sample.
An examination of all these cases will show that the act
authorizing the lease expressly provided that it should
not relieve the lessor from liability. The learned coun-
sel likewise relies upon the case of Nelson v. Railroad,
26 Vt. 721. That case was decided by Judge REDFIELD,
who, in the subsequent editions of his work upon rail-
roads, distinctly states that the effect of legislative
consent was not met or decided in the Nelson case.
1 Redfield on Railways, p. 618, note; see, also, Arrow-
smith v. Railroad, 57 Fed. 176. (8) It has been said
in a recent work upon street surface railroads that:

"Where a lease of a city railroad is duly authorized by law, the lessee only is liable for the negligence in its operation." Nellis on Street Surface Railroads, p. 266, sec. 16; 2 Elliott on Railroads, sec. 469; Hutchinson on Carriers, sec. 575; Pierce on Railroads, sec. 283; Patt. Ry. Acc. Law, secs. 130, 131; 5 Thompson on Corporations, sec. 5884, n.; Booth, Street Railway Law, sec. 425. The rule established in Missouri seems to follow the text-books above cited. Brown v. Railroad, 27 Mo. App. 400; Speed v. Railroad, 71 Mo. 310. (9) This question is not to be confounded with one where there is a lease of a domestic corporation in Missouri to a corporation of another State, because the statute which authorizes such a lease has the express reservation that the lessor "shall remain liable as if it operated the road itself." Markey v. Railroad, 185 Mo. 359. The following cases fully sustain the doctrines of the text-book above cited: Pinkerton v. Penn. Traction Co. (Sup. Ct. Pa.), 44 Atl. 284; Heron v. Railroad, 71 N. W. 706; Hayes v. Railroad, 74 Fed. 279; Caruthers v. Railroad, 54 Pac. 673; Arrowsmith v. Railroad, 57 Fed. 165; Mahoney v. Railroad, 63 Me. 68; Scziwak v. Railroad, 4 Pa. Dist. R. 339; Railroad v. Washington, 10 S. E. 927; Evans v. Railroad, 18 S. W. 493; Buckner v. Railroad, 18 So. 449; Lakin v. Railroad, 12 Ore. 436; Miller v. Railroad, 125 N. Y. 118; Gwathney v. Railroad, 12 Ohio St. 92; Fisher v. Railroad, 34 Hun 433; Railroad v. Mangum, 68 Tex. 342. (10) Cases may be found which broadly hold that even an authorized lease does not absolve the lessor from liability. In the main, those cases are founded on the breach of some duty which the lessor was bound to perform, and for the violation of which he was liable. Such a responsibility on the part of the lessor can only be avoided by some statutory exemption. These cases are good types of that class: Nugent v. Railroad, 80 Me. 62; Railroad v. Curd, 28 Kan. 622. But as to all injuries arising from operation

by the lessee, an authorized lease exonerates the lessor from liability. The several classes of cases are well collected by Judge LURTON in Arrowsmith v. Railroad, 57 Fed. 165. A careful reading of that opinion will enable this court to assign each case to its class, and thus simplify the question. (11) The question of whether the paper read in evidence by plaintiff is a lease cannot admit of much debate. The statute authorizes a lease. R. S. 1899, sec. 1187. The ordinance No. 19738, by section 3, authorizes the companies named therein, and their successors, or any line with which said companies, or any of them, intersect, to sell, convey or lease their lines to the St. Louis Transit Company. The ordinance No. 19352, by sec. 1, expressly provides that the Central Traction Company (now the United Railways Company), may "sell, lease or otherwise convey their property, privileges and franchises, and when so sold, leased or conveyed, the company acquiring the same shall have and enjoy all the rights and privileges herein granted and to acquire by lease or purchase the property and franchises and privileges of other street railways in St. Louis." Under these powers, and by virtue of votes of the shareholders and directors of the two companies, as recited in the lease, that document was executed. What is there in this whole transaction to lead to any doubt that that paper is a lease? What is a lease? 18 Am. and Eng. Ency. Law (2 Ed.), 598, 599. The term is definitely fixed by the *habendum*. The exclusive possession is granted the lessee for the term, as well as the right to operate. The rent reserved is fixed by paragraphs 2 to 7. Nonperformance of the covenants of the Transit Company as to payment of rents reserved is made a cause of forfeiture. The lease is acknowledged and recorded in the same manner as any other grant or deed. What does it omit to make it a formal lease? We can conceive of nothing. The retention of title by the lessor

or provisions for reversion of the property are essential to a lease. Edwards v. Noell, 88 Mo. App. 440; 1 Platt on Leases, p. 18. Participation in a percentage of the gross receipts instead of fixed rental for the lease of a railroad does not render the lessor liable for negligence of the lessee in the operation of the road. Phillips v. Railroad, 62 Hun 232. The fact that the lessor was bound to pay for improvements made by the issue of its bonds to the lessee does not render the lessor liable. Miller v. Railroad, 125 N. Y. 118. The case of Arrowsmith v. Railroad, 57 Fed. 165, and the text-books cited by us, conclusively show that the great weight of authority holds that for negligence in the operation of the road by the lessee, no legislative exemption is necessary to absolve the lessor from liability. The rule that prevails in Illinois that while the authority to lease may exist, yet unless the act specially exempts the lessor from liability, the lessor remains liable for negligence in the operation of the road, is expressly denied by the Circuit Court of the United States sitting in that State. Hayes v. Railroad, 74 Fed. 283. (12) It is urged by appellant that it is not shown by the record that the United Railways Company of St. Louis and the St. Louis Transit Company accepted the provisions of section 1187, Revised Statutes 1899, and the ordinances of the city of St. Louis, authorizing the execution of the lease, and therefore the lease was executed without lawful authority. There are two answers to this proposition: First: "Acts done by a corporation which pre-suppose the existence of other acts to make them legally operative, are presumptive proof of the latter." Bank v. Dandridge, 12 Wheat. 64; 1 Jones on Evidence, sec. 50; State ex rel. v. Kupferle, 44 Mo. 158; Ins. Co. v. Smith, 73 Mo. 371; Chouteau v. Railroad, 122 Mo. 384. Second: The record shows that plaintiff offered the lease in evidence for all purposes, thereby vouching for the regularity of

its execution, and she cannot now be permitted to raise the question of want of lawful authority to execute it.

GRAVES, J.—The contention involved in this case is one of much interest; just what may be involved, more than the case under consideration, we have no means of knowing, but there are no doubt a number of cases dependent upon the views of this court in this case. As we gather it the question of the liability of the defendant United Railways Company has been up before four Federal judges and all of the several divisions of the circuit court of the city of St. Louis. In each case the exact question as to the character of the written instrument involved in this case was an issue. The four Federal judges, as well as the judges of the St. Louis Circuit Court, with the exception of two, have held that there was no liability so far as the United Railways Company is concerned. So much for the previous history of the question involved in this controversy.

This particular case comes here from the St. Louis Court of Appeals, owing to a minority opinion and a certification of the case under the Constitution, on the ground that the majority opinion was opposed to the opinion of this court in Markey v. Railroad, 185 Mo. 348. The principal majority opinion by that court was rendered by GOODE, J., which was concurred in by NORTONI, J., in a separate opinion. The dissenting opinion is by BLAND, P. J. The magnitude of the issue as effecting this and other similar cases, has admonished us to a thorough investigation of the case and statutory law, tending to throw light upon the issue. Each of the opinions of the several judges of the St. Louis Court of Appeals bears the earmarks of thorough investigation and an able attempt to reconcile the case law. Here it will be well to say that the judges of the St. Louis Court of Appeals, while differing upon

other questions in the case, all agree that the instrument in writing involved in this case is a lease, and in this we think they are correct. The analysis of the case, both as to facts and law, is so thoroughly made by Goode, J., that we adopt his opinion as the opinion of this court, save that we desire to add thereto the full text of the learned, and to our mind, unanswerable statement of the law of this case contained in 2 Elliott on Railroads, sec. 469. The language of the text-writer is as follows:

"Our opinion is that where the lease is executed under the provisions of a statute, in accordance with its requirements, is made to a company having authority to accept it, and is made in good faith and not for the purpose of transferring duties or obligations to an irresponsible party, the lessor company is not liable for injuries caused by the negligence of the lessee and not attributable to a breach of any public duty of the company that executed the lease. It must be assumed that in granting the authority to execute a lease the Legislature had in mind former statutes as well as the established rules of the common law. When power to execute a lease is conferred upon a corporation the Legislature must, in the absence of countervailing language, be deemed to intend to authorize the execution of such an instrument as the established law regards as a lease. The law enters as a silent factor into every contract, and hence of every lease it is an important element. The legal effect of a lease is to transfer for a prescribed period of time the possession and control of the property to the lessee. In authorizing the execution of a lease the Legislature grants the right to execute and carry into effect such an instrument as divests the lessor of possession and control and places it in the lessee to the exclusion of the lessor. The possession of the one party is excluded and that of the other is made complete by the legisla-

tive sanction.  If a sale is made under valid legislative authority the company that acquires the property acquires an exclusive right and interest, and the lessee by virtue of the lease acquires a similar right so far as possession, control and management are concerned, for the term for which the property was leased.  It cannot be doubted that a statute conferring general authority to sell means a complete and effective sale, and upon the same principle it must be concluded that the power to lease, unless qualified and limited by statute, is a power to make a complete and effective lease.  A complete and effective lease certainly vests the right of possession, control and management in the lessee, since no other effect can be assigned such a lease without a direct and palpable violation of long and well-established principles of law.  The lessor company does no wrong in executing a lease which the law of the land gives it full power to execute, so that in executing the lease there is no improper motive, no illegal act, nor any wrongful attempt to escape a duty.  In granting authority to lease, the Legislature empowers the lessor company to transfer the duty of operating the road to the lessee, and in doing what the Legislature authorizes no rule of public policy is violated.  It is, indeed, inconceivable that there can be a violation of a rule of public policy where the act done by a party is done under a legislative enactment and in accordance with its provisions.  The cases which hold the lessor liable, although the lease is an authorized one, upon the ground that there must be an express exemption from liability in order to exonerate the lessor, concede, what could not be denied without leaving the domain of reason, that the Legislature may by express enactment exonerate the lessor, so that even upon that theory (which we believe to be unsound) the question, at bottom, is one of statutory construction.  The courts which assert the theory mentioned

assume that in granting authority to lease, the Legis-
lature granted something less than an authority to
lease. We believe that the only theory that can be de-
fended on principle is that in granting authority to ex-
ecute a lease the Legislature conferred authority to ex-
ecute an effective instrument with all the qualities and
incidents with which the law invests a lease.
If this be true then the lease does transfer pos-
session and control from the one party to the other
for the term of the lease, and the rights and obligations
of the parties are such, and such only, as the law an-
nexes to the relation of lessor and lessee. For negli-
gence in managing and using the demised premises the
lessor is not responsible. If it has performed its duty
in constructing tracks and necessary structures it can-
not be held responsible for the negligence of the lessee
in employing incompetent servants, or in negligently
handling trains, or in negligently overloading cars, or
in negligently failing to provide a sufficient number of
persons to manage trains, or for any negligence which
relates solely to the mode of operating the leased
road.''

Judge Goode's opinion follows:

''The petition alleges that plaintiff was hurt by
the negligence of defendant's servants in suddenly and
violently starting a street car on which she was a pas-
senger, and while she was walking in the aisle to a
seat. The action was instituted against the St. Louis
Transit Company and the United Railways Company,
and both are alleged to have owned and been engaged
in operating the car and the line of railway on which it
was running. The answers, filed by the two defendants,
were both general denials. Evidence was adduced tend-
ing to prove the plaintiff was injured in the manner
alleged, and that it resulted from the negligent con-
duct of the car's crew. It is conceded by the plaintiff
that the evidence proved the car was operated by the

Transit Company under and by virtue of a written instrument executed by the two companies and purporting to be a lease. The only evidence relied on to fasten liability for the accident on the United Railways Company was this contract. The jury were instructed to return a verdict against both of the defendants, if they found the issues for the plaintiff. A verdict against both having been returned, the court sustained motions filed by the United Railways Company for a new trial and in arrest, on grounds equivalent to an express ruling that it was not liable to the plaintiff. Similar motions filed by the Transit Company were overruled. The result was, that plaintiff appealed from the order sustaining the motion of the United Railways Company and the Transit Company appealed from the judgment against it, but afterwards dismissed its appeal. Two ordinances of the city of St. Louis were put in evidence, one of which is relied on as giving the city's consent to the leasing by the United Railways of the line on which plaintiff was hurt, to the Transit Company. The title and two paragraphs of that ordinance will be copied. The title is as follows:

"'An ordinance for the greater convenience and further transportation of passengers on the railways of the Cass avenue and Fair Grounds Railway Company, Citizen's Railway Company, Southwestern Railway Company, Southern Electric Railroad Company, St. Louis Railroad Company and Baden and St. Louis Railroad Company, respectively, and for that purpose authorizing change of motive power, the connection of railway tracks respectively, and the running of cars of one or more of said companies on the tracks of one or more of the other companies, and of such companies whose tracks may be intersected by the tracks of either of said companies, with authority to run ambulance, funeral, mail and express cars, and also authorizing if found desirable for said purpose, the sale, conveyance

or lease of the rights, privileges, franchises and property of one or more of said companies, and of the companies whose tracks may be so intersected, to another of said companies or to the St. Louis Transit Company, its successors and assigns, and the acquisition thereof, with authority to hold, enjoy and operate the same for a period expiring with the term of the franchise of the Southern Electric Railroad Company, as provided in City Ordinance Number fourteen thousand, eight hundred and thirty-seven, and to regulate the speed of cars, and authorizing the Southwestern Railway Company to extend its tracks on Gravois avenue from its intersection with the Morganford road to Bates street, and there to connect with the tracks of the Southern Electric Railroad Company, and extending the time for the completion of its tracks from Grand avenue on Chippewa street and Gravois avenue to the Morganford road, and the Southern Electric Railroad Company to extend its route on Loughborough avenue, Gravois avenue and Bates street, and to operate the same.'

"The first and third sections of the ordinance read:

" 'Whereas, it will be to the great advantage of passengers to have the tracks of the Cass avenue and Fair Grounds Railway Company, Citizens' Railway Company, Southwestern Railway Company, Southern Electric Railroad Company, St. Louis Railroad Company and Baden and St. Louis Railroad Company, respectively, connected, and the cars of said companies respectively, run on the track or tracks of others of said companies;

" 'Therefore, the St. Louis Railroad Company is hereby authorized to connect its tracks on Broadway with the tracks of the Citizens' Railway Company at Morgan street and Franklin avenue, and to connect its tracks on Broadway and Walnut streets with the

tracks of the Cass avenue and Fair Grounds Railway
Company, and its tracks at Broadway and Elm street
with the tracks at that point, and to connect its tracks
at or near Broadway and Keokuk street with the tracks
of the Southern Electric Railroad Company; and au-
thority is given to the Southwestern Railway Company
to connect its tracks with the Southern Electric Rail-
road Company at Chippewa street and Jefferson
avenue; and thereupon with the consent of the St.
Louis Railroad Company and said Citizens' Railway
Company, Cass avenue and Fair Grounds Railway
Company, Baden and St. Louis Railroad Company,
Southern Electric Railroad Company and the South-
western Railway Company, respectively, the cars of
said companies respectively, may be run on each other
of said companies' tracks respectively, and upon the
tracks of any railway company with which any of the
tracks of said companies may intersect, and may be
agreed upon between them respectively, and with such
companies whose tracks may be so intersected, and for
that purpose authority is hereby given to make desir-
able curves and switches and connections therewith, and
the cars shall be run at the same rate of speed on
the tracks on which they may run as is now provided by
ordinance for the running of cars thereon.'

" 'Section 3. For the better effecting the pur-
pose of this ordinance, the said Cass avenue and Fair
Grounds Railway Company, Citizens' Railway Com-
pany, Southwestern Railway Company, Southern Elec-
tric Railroad Company, St. Louis Railroad Company,
Baden and St. Louis Railroad Company and any com-
pany whose tracks may be intersected by the tracks of
any of said companies, and their successors and as-
signs, are hereby severally authorized to sell, convey,
or lease, if found desirable, their property, rights,
privileges and franchises now owned and held, or here-
in granted, respectively, to any of the said companies

named in this section, or to the St. Louis Transit Company, its successors and assigns, the said company and its successors and assigns so acquiring such property, rights, privileges and franchises, is hereby authorized to acquire, hold and enjoy the same during the term of this ordinance; provided, however, that if such acquisition is had, passengers shall be transported over the whole or any part of said railroads or railways, in the city of St. Louis, so acquired, on one continuous ride for one fare, and for that purpose transfers may be made at convenient points.'

"It was admitted on the trial that the United Railways Company (sometimes called herein the Railways Company) acquired by purchase all the railroad lines named in paragraph one of the ordinance, that two-thirds of the stockholders of the two corporations passed resolutions authorizing the lease, and that the contract of lease was duly executed.

"The contract recited that the United Railways Company and the St. Louis Transit Company were, at the date of the instrument, corporations, organized under the laws of the State of Missouri; that the former owned several lines of railway in the city and county of St. Louis, and certain bonds and stocks described in a deed to the St. Louis Transit Company of date September 30, 1899; that the United Railways Company was willing to lease its railway lines, property and franchises, and all the income from its bonds and stocks to the Transit Company for a period beginning October 1st, 1899, and ending April 1, 1939, and that the Transit Company was desirous of acquiring said lines and franchises by lease. The contract then proceeds to say: 'Now, therefore, this agreement witnesseth, That United Railways for and in consideration of the covenants and agreements hereinafter contained on the part of the Transit Company, to be by it made, kept and performed, has granted, demised and leased, and

by these presents does grant, demise and lease unto Transit Company all of the railways' etc. The subsequent portion of the instrument may be summarized as follows: The Transit Company acquired from October 1, 1899, to April 1, 1939:

"First. All the railroads constructed, owned or operated by the United Railways Company or that it might thereafter construct, own or operate.

"Second. All the property, real, personal or mixed, held by the United Railways as owner or otherwise or that it might acquire.

"Third. All the income derived from any bonds or stocks owned by the United Railways or which it might acquire.

"Fourth. All franchises belonging to the United Railways or which it might acquire, except the franchise to be a corporation and any other right or franchise necessary to preserve its corporate existence and organization.

"Fifth. Exclusive right to use, manage and operate the railways and fix and collect tolls, but not at higher rates than United Railways was empowered to fix them.

"Sixth. All money of the United Railways on hands at the date of the lease or received by it afterwards from any source. (Par. 9.)

"The Transit Company, as consideration, agrees:

"First. To pay a net annual rental of five dollars per share on all the preferred stock of the United Railways then outstanding or that might be issued with the consent of the Transit Company; said rental to be paid quarterly on the 10th days of January, April, July and October of each year.

"Second. At its own cost and expense and without deduction from the rent (a) to maintain, operate, work, use and run and keep in public use the demised railways in the same manner the lessor, the United Railways, was required to do; (b) keep the demised

railway and their property in good repair, working order and condition and supplied with rolling stock and equipment so as to develop the business; (c) make any repairs and replacements on the demised property, and all additions to and improvements thereon, and provide such new and additional rolling stock from time to time as might be necessary for the proper operation and use of the property.

"In payment for the additions, acquisitions, betterments and improvements made by the Transit Company to the property demised, the contract provided that the United Railways, when requested by the Transit Company or on its order, should deliver to the latter bonds of the first general mortgage bonds secured on the rented railway at par and authorized to be issued for improvements; or, in lieu of said bonds, any unissued preferred or common stock of the United Railways at the option of the Transit Company.

"Third. In addition to the regular rental, the Transit Company agreed to pay the United Railways Company $1,000 a year for the purpose of defraying the expenses of maintaining the corporate existence of the United Railways and companies connected with it.

"Fourth. Pay all the floating debts of the United Railways Company.

"Fifth. Pay all tolls, assessments and water rents assessed against the property of all kinds of the United Railways Company.

"Sixth. Pay the interest on the bonds thereon issued by the United Railways and the subordinate companies whose lines had been acquired by the United Railways Company and included in the lease to the Transit Company. Seventeen issues of bonds aggregating about $35,788,000 are enumerated under this item of the consideration paid by the Transit Company for the lease.

"Seventh. Keep the demised property insured at its own expense.

"Eighth. Apply all net surplus earnings above 6 per cent annual dividends on its capital stock, either to the extension and betterment of the leased lines of the railway, or the redemption of the mortgage indebtedness on the leased property.

"Ninth. To apply all money not needed for current liabilities or interest turned over to it by the United Railways, or on hand at the date of the lease, or received by the United Railways thereafter from the rent of useless property, to the improvement of the demised property.

"A. The Transit Company agreed to 'indemnify, save and keep harmless the United Railways during the continuance of the lease from all costs, charges and expenses arising from the management and operation of said Railways and all matters incident thereto.' (Par. 1 of lease.)

"B. The United Railways agreed in effect to maintain its corporate existence, and when requested by Transit Company, put in force and exercise each and every right it owned or might acquire, and do every lawful corporate act necessary or proper to enable the Transit Company to avail itself of the franchises and property demised; and the Transit Company agreed to indemnify the Railways Company 'against all expense, loss, damage or liability for such exercise of corporate power or performance of corporate acts.'

"C. The right of re-entry on the demised property was restored to the United Railways in the event the Transit Company failed to keep any of its covenants. It was provided that a re-entry for non-performance of covenants by the Transit Company should not prejudice the right of the United Railways to recover damages for the default.

"D. All cars, machinery, tools, appliances and other personal property belonging to United Railways

should be turned over to Transit Company as soon as the lease took effect, and, in case of the termination of the demise, should be restored to the Transit Company, or in lieu thereof its value paid; the value to be found by an appraisement.

"E.   On termination of the contract for breach of covenant, all betterments previously made by the Transit Company became the property of the United Railways.

"F.   The Transit Company agreed to keep true accounts of its receipts and disbursements, and that its books should be open to inspection by the United Railways.

"G. . Differences arising between the two parties regarding the meaning of any part of the lease, and other matters, were to be settled by arbitration.

"That the United Railways Company is liable in damages to plaintiff notwithstanding the contract between it and the Transit Company, and the operation of the line and car on which she was hurt by the Transit Company, pursuant to the contract, is maintained on three grounds: first, that if the contract is a lease, it is inoperative for lack of consent to the leasing by the city of St. Louis; second, that the contract is not a lease, but in legal effect is an agreement by the Transit Company to operate the railway lines it was put in possession of for the United Railways Company as the latter's agent, or else is a partnership agreement between the two companies; third, that if a valid lease, the United Railways Company as lessor remained liable for all torts of the Transit Company as lessee, because the statute allowing such leases by street railway companies contains no clause expressly exempting a leasing company from liability for the acts of the lessee.

"The Constitution of the State forbids the enactment of a statute granting the right to construct and operate a street railway in any city without first ob-

taining the consent of the local authorities, and forbids too the transfer of a right or franchise to occupy a street with a street railroad without first obtaining such consent. [Const. art. 12, sec. 20.] The argument for the plaintiff is that the ordinance relied on as giving the consent of the city of St. Louis to the lease in question did not, in truth, give consent, because it only authorized the railway companies named in it to lease the lines of railway named, including the one on which plaintiff was hurt, and did not authorize a lease of the properties by the United Railways Company, which was not named. It will be seen that the third section of the city ordinance, which we have quoted, expressly authorized the lease of the line on which plaintiff was hurt to the St. Louis Transit Company by its original owners, one of the companies named, which one is not disclosed by the evidence. It is admitted that the United Railways Company acquired by purchase all the lines of railway owned and operated by all the railway companies mentioned in the ordinance. There is no sound reason for saying that the United Railways Company, though the owner of the line pursuant to a valid purchase, could not lease it to the Transit Company just as the original company might, pursuant to the permission given to the latter by the city. The city had authorized the Transit Company to acquire it by lease, and municipal interests could not be helped by permitting the original owner to grant the lease, and refusing to permit a lawful purchaser to do so, when the lessee, in either event, would be the same. The decisive fact bearing on this point is not, as plaintiff's counsel insists, that the United Railways Company received no authority to lease the line of railway on which plaintiff was hurt to the Transit Company. It is that the latter was authorized to take a lease of it. Hence the argument that the words of the ordinance purporting to empower the

street railway companies named and 'their successors and assigns,' to lease their several railway lines, did not operate and empower the United Railways Company as purchaser of said railway lines to lease them, is not relevant to the proposition that the lease is void for lack of the city's consent. The case of Oregon Railroad Company v. Oregonian Railroad Company, 130 U. S. 1, decides that the words 'successors and assigns,' as used in various State statutes in connection with specific grants of power to railway companies, did not necessarily import that the Legislature intended to empower railway companies to lease or sell the entire property. There was no Oregon statute undertaking in express terms to empower a railway company to assign or lease all its property; but an attempt was made to deduce a sweeping power of that kind from general statutes granting authority to do many things to railway companies 'their successors and assigns.' These statutes were said to show the Legislature intended that any power or franchise granted to a railway company in the general laws under which all railway companies must be incorporated in Oregon, might be exercised and enjoyed by an assignee or successor of the original company; that hence, the statutes, by implication, authorized a company to assign or lease its entire property. It is plain that this argument was far-fetched, and in conflict with the rule universally enforced, that a lease or assignment of all its franchises and assets by a corporation created for public purposes and charged with public duties, thereby disabling it to serve the public, is void unless authorized by statute. [Thomas v. Railroad, 101 U. S. 71; Railroad v. Railroad, 118 U. S. 290, 309; Beman v. Rufford, 1 Sim. (N. S.) 550; Railroad v. Railroad, 9 Hare 305; Winch v. Railroad, 5 De-G. & S. 562.] The proposition decided in Oregon Railway Company v. Oregonian Ry. Company gives no support to the proposition that the lease by the United

Railways Company to the Transit Company is void because not assented to by the city, for the city did assent; and in connection with its assent attended to the detail of selecting the lessees which might take, one of them being the Transit Company which did take. Were it necessary, other cogent reasons could be given against the position that the lease contract under examination is void because in conflict with the constitutional provision we have cited, but the foregoing are deemed sufficient.

"Is the agreement between the companies a lease or a contract for the operation of the United Railways Company's lines by the Transit Company as the agent of the former company and for its benefit? Did it constitute a partnership? We will first deal with the legal effect of the instrument as ascertained from its terms, and not with a possible ulterior motive or purpose which may have prompted its execution. If the agreement was not entered into in good faith and for the purpose declared, but to defeat the creditors of the United Railways Company or enable its properties and franchises to be held and exercised for its benefit in a manner that would screen it from judgments and relieve it of responsibility, no doubt the United Railways Company would be held liable without regard to the contract. But such an issue would be for the jury unless the instrument itself, or facts in evidence, show the truth beyond dispute. No fact *aliunde* to cast suspicion on the transaction was shown; and if the agreement is to be ignored on the ground that it was not entered into in good faith the ground must be established by the contents of the instrument. This matter will be recurred to again. The question to be settled first is as to the legal nature of the agreement as written. It is apparent that the contract is more than an operating one; for it transferred to the Transit Company other property than the railways and their ap-

purtenances belonging to the United Railways Company and required the Transit Company to perform other acts besides operating the railway lines. The Transit Company acquired every franchise held by the United Railways Company except the franchise to be a corporation; all the latter company's property, real, personal and mixed; all the income derived from its bonds and stocks; the money it had on hand at the date of the agreement, and what it might receive afterwards by the sale of unusable property. Besides operating the railways, the Transit Company was bound to do various acts, such as keeping them in repair, making extensions and improvements and meeting the interest on bonded obligations. Therefore, it is obvious that if the agreement between the two companies was one for the operation of the railways, that term in the agreement, though perhaps the principal and most important one, was mingled with others of much importance. We can think of only three conditions on which the Transit Company could operate the United Railways Company's lines for the benefit of the latter. These are: first, operate them for absolutely no reward and as a mere gratuity to the United Railways Company; second, for compensation either in the form of a regular payment by the United Railways Company for the service or for a percentage of the earnings; third, on a partnership arrangement between the two companies. The agreement certainly did not contemplate that the Transit Company should operate the railways for nothing, nor was it allowed a fixed stipend or a percentage of the receipts in payment for its services. On the contrary, instead of being paid to operate the line, it agreed to pay the United Railways Company for the possession and use of the property during a stated period, the payments to be made at regular intervals and bearing all the characters of a fixed rent charge. The agreement did not provide that the Transit Com-

pany should conduct the business in the name of or for
the benefit of the United Railways Company, except in
so far as the latter company was benefited by the con-
sideration to be rendered by the Transit Company.  It
would be a very forced construction for us to torture
the agreement by which the Transit Company was to
yield fixed sums at regular intervals for the use of the
property, into a contract of agency which made the
United Railways Company principal and the Transit
Company agent.  All the elements of such a relation-
ship are absent.

"Neither did the contract make the two companies
partners, either between themselves, or as to third par-
ties.  A division of the profits of a business is not alone
sufficient to constitute a partnership.  The essential
test is whether the parties asserted to be in partnership
intended to establish that relation.  [McDonald v. Mat-
ney, 82 Mo. 358; Mackie v. Mott, 146 Mo. 230.]  Man-
ifestly the two defendant companies had no thought of
becoming partners; and as they did not hold them-
selves out to the world as such, there is no ground for
holding they were.  Therefore, we find that neither the
relation of principal and agent or of partnership can
be applied with propriety to the contract.

"Does the contract possess the elements of a
lease?  In this connection it is proper to remark in the
first place that goods, chattels and franchises may be
leased as well as land and tenements.  [1 Platt, Leases,
p. 24; 1 Wood, L. & T. (2 Ed.), sec. 202; 1 McAdam,
L. & T. (2 Ed.), p. 258; 1 Taylor, L. & T. (9 Ed.), secs.
17 and 18.]  A statute of the State gave the United
Railways Company the right to lease its franchises,
railway lines and every other property, and by the
same statute the Transit Company had the right to ac-
quire every character of property, belonging to the
United Railways Company, including its franchises.
[R. S. 1899, sec. 1187.]  We need not be troubled about

the power of the two companies to enter into a lease
covering all the properties mentioned in the instru-
ment.  The contract in question divested the United
Railways Company of the possession and use of the
properties during the period named (40 years) in con-
sideration of a specific rent to be paid by the Transit·
Company, and other duties, in the nature of rent, to be
performed by the latter; provided, further, for the re-
version of the property to the grantor, the United
Railways Company, at the end of the term, and for a
re-entry if the Transit Company defaulted in the per-
formance of its covenants during the term.
Those ingredients in the agreement suffice to con-
stitute a lease.  [1 McAdam, L. & T., sec. 47, p.
127.]  The contract on its face shows that it was in-
tended to be a lease, and contains the elements essential
to constitute one.  Therefore there is no reason for
hesitating to pronounce it a lease in legal effect and
only to be impeached by facts showing it was not ex-
ecuted in good faith.  Documents of like tenor have
been before courts for construction several times and
they were treated as leases.  [Mayor v. Railroad, 113
N. Y. 311; Miller v. Railroad, 125 N. Y. 118; Driscoll
v. Railroad, 65 Conn. 230; Terre Haute Railroad v.
Cox, 102 Fed. 825.]  In fact, most of the cases relied
on by the plaintiff accept such contracts as leases;
though for different reasons the lessors were held re-
sponsible to third parties for torts of the lessees. We are
cited to the case of St. Jos., etc., Railroad v. Iron Moun-
tain Railroad, 135 Mo. 173, as construing a contract
like the one under review to be an agreement by a nom-
inal lessee to operate a railway for the benefit of a nom-
inal lessor, and hence, in legal effect, not a lease but an
operating agreement.  But in that case the terms of the
instrument construed were quite different from those
of the instrument before us.  The decision of the court
that it was a mere operating contract, was rested prin-

cipally upon the fact of there being no stipulation for
rent to be paid for the use of the property which was
the subject-matter of the contract.  In that case the
Iron Mountain Railway Company, which was alleged
to be a lessee of the lines of railway owned by the Wa-
bash Railway Company, was obligated by the supposed
lease to pay nothing in the way of rent except what
might be earned by the operation of the roads.  That
is to say, the Iron Mountain Company simply took over
the roads to operate and apply the earnings for the
benefit of the Wabash Company.  The Iron Mountain
Company did not assume any individual liability of any
kind in consideration of the supposed lease, nor bind
itself or its assets for any rent.  It was for this fact
that the contract between the two companies was held
not to be a lease, but an operating agreement.  The
opinion says:

" 'After a careful consideration of all its terms
and stipulations, we are constrained to hold that it is
not (i. e., a lease).  Its use of the words 'demise' and
'lease' can not be held to be controlling.  For want of
a better definition it may be styled an operating con-
tract, under the stipulations of which the Wabash re-
tains all the substantial and beneficial interest in its
several railroads and leased lines, and in which the
Iron Mountain railroad, under the power of attorney
therein granted, assumes to operate the Wabash sys-
tem, collect the tolls and freights, and disburse them
for the sole use and benefit of the Wabash, subject at
all times to the supervision of the board of directors
of the Wabash as to its management and the right to
inspect its books and the accounts of the earnings and
disbursements.

" 'It will be observed that the Iron Mountain no-
where in said contract binds itself to pay the Wabash
a certain rent unconditionally out of its own moneys
and revenues.  It merely undertakes that out of the

earnings of the Wabash it will, so far as they will suffice, pay the fixed charges which the Wabash had already assumed, and if there is any surplus to pay this over as directed by the board of directors of the Wabash. Under no circumstances are the earnings of the Wabash system or any part thereof to become the property of the Iron Mountain. All idea of individual liability of the Iron Mountain over and beyond the earnings of the Wabash for any of the obligations assumed is carefully and studiously excluded. There is no right on the part of the Wabash to a certain profit issuing periodically out of its properties as rent reserved.

" 'Instead of passing to the Iron Mountain a definite determinate estate of which it should be the absolute owner, it seems to us that the true effect of the whole instrument was to leave the beneficial estate in the Wabash and to constitute the Iron Mountain its agent to manage and operate the road subject to the supervision of the Wabash and with the right of the Wabash to know at all times that the earnings and receipts were being disbursed for its use and benefit. While it was a perfectly valid contract, it is a misnomer to call it a lease or a sublease. [State ex rel. v. Schweickardt, 109 Mo. 496; Anglade v. St. Avit, 67 Mo. 434.]

" 'To transform this carefully guarded undertaking merely to operate the road for the Wabash and account to it for all the earnings and disburse them for its sole use, into the unconditional and absolute liability assumed by the Wabash in the lease from plaintiff to it, would certainly be subversive of the clear intention of the Wabash and the Iron Mountain, and, as already said, this ought never to be done unless the established rules of law will permit no other alternative.'

"By the contract before us the Transit Company's liability for rent was not confined to the earnings of the leased property. The Transit Company was a corporation with a capital stock running into the millions, and its property was all subject to the obligation of its contract with the United Railways Company to pay the various charges and items of rent enumerated in the lease.

"But it is insisted that paragraph 9 of the lease bound the United Railways Company to turn over to the Transit Company any money received by the former from any source and, therefore, whatever rent the Transit Company paid would be repaid to it; thus showing there was no real consideration for the lease. One item of rent is to be used to maintain the corporate existence of the United Railways Company. Another item to be paid quarterly is in the nature of a dividend on the preferred stock of the Railways Company. We hardly think the ninth paragraph intends that those cash items of rent, which are to be paid to the Railways Company, must be returned by it to the Transit Company; but that the fair interpretation of the lease, taking into consideration all its terms with reference to this point, is that it aimed to transfer all the lessor's assets of every kind for an agreed rental. The Transit Company became entitled to all the assets of the Railways Company, including cash on hand, or that might come to it from the sale of property or other sources except the rent, which was the consideration to be paid for the transfer to and use by the lessee of the assets. The purpose of paragraph 9 seems to be to bind the Transit Company to use the cash received from the Railways Company in keeping the leased property in good repair. However, we are not called on to construe the ninth paragraph as to this question; because no one will contend that its language bound the Railways Company to reimburse the Transit Company

for money paid by the latter as rent, not to the Railways Company, but to third persons on the obligations of the Railways Company. Now, the Transit Company, as lessee, agreed to pay all the floating debts of the Railways Company (par. 4), all its taxes, assessments and water rents (par. 5), the interest on the various issues of bonds secured on the different lines of railway (par. 6), and the insurance premiums on the property (par. 7). These chief items of the rent, running annually no doubt into many thousands of dollars, the lessee was bound to pay to third parties and not to the lessor, and there is nothing in paragraph nine, or any other part of the lease, which bound the lessor to reimburse the lessee for the amounts thus paid. And, as said, the Transit Company was bound to pay these and the other items of rent even though the operation of the railways failed to earn enough money to meet the obligations. This contract is, therefore, radically different from the one construed in St. Jos. Railroad v. Iron Mt. Railroad, supra, and presents the essential elements of a lease.

"The proposition next to be considered is, conceding that the contract was a lease, did the United Railways Company nevertheless remain responsible for injuries to a passenger resulting from the negligence of the Transit Company? In other words, is a leasing railway company so far liable for the torts of the lessee that it must answer in damages for a tortious injury to the passenger? This question is one on which there is a great diversity of judicial opinion; but it is proper to state as a circumstance bearing on the weight of authority, that in most of the cases affirming the liability of the lessor, there were dissents. I think the preponderance of authority, and the great preponderance of reason are against the liability of the lessor in such cases. I think, too, that as a rule of law the doctrine that the lessor is liable is at war with the general rules

and principles governing the liability of lessors for the acts of their lessees and the settled canons of statutory construction. As the statutes of this State give a street railway company power to lease all of its property to another street railway company, there was direct statutory authority for the lease in dispute; and only those adjudications are exact precedents wherein statutory authority for the controverted lease existed. The particular statute authorizing such leases appears in the Revised Statutes of 1899 as a new section, 1187. It is said not to have gone into force until November 1, 1899, and too late to confer authority for the contract we are dealing with, which was dated September 30, 1899, and took effect on October 1, or the next day. But the statute was enacted with an emergency clause and approved June 19, 1899, prior to the contract in question. It is further said that the enactment only conferred the power to lease on corporations formed under the act and that both the United Railways Company and the Transit Company were incorporated under prior statutes. But by section 15 of the act, any street railroad company theretofore organized under any general or special law of the State was granted all the powers, benefits and privileges of the act if it would file in the office of the Secretary of State a resolution of its board of directors accepting the provisions of the act and paying into the State Treasury the fees required by section 13. The present record does not show whether or not the United Railways Company or the Transit Company complied with section 15; but in considering this ponit it is to be remembered that the United Railways Company did not introduce in evidence the contract with the Transit Company as matter of defense, and hence was not bound to show affirmatively it had power to execute the contract, as would have been incumbent on it had it sought to evade liability by proving the lease. The instrument was in-

troduced by the plaintiff to fasten liability on the United Railways Company, and there was no contention that the said company was without power to execute it because of failure to take advantage of the act of July 19, 1899, in the manner provided in section 13. The plaintiff relied on an instrument which she contended the United Railways Company had executed, to prove said company was liable to her on several grounds; none of which was lack of statutory power to make a lease. Hence, it ought to be presumed, in the absence of proof to the contrary, that the two companies which were parties to the alleged lease, or at least the United Railways Company, had complied with the requirement of the statute authorizing street railway leases and had become entitled to the benefits and powers conferred on complying companies.

"Cases affirming the liability of a leasing railway company for torts of the lessee should be classified with reference to the existence of such a statute when the lease was executed. All courts agree that, in the absence of a statute, a lease of its property and franchises by a railway company does not relieve it of its public duties and responsibilities, and that the lessor remains liable for the torts of the lessee. In other words, there is no common law authority for such leasing by railroad companies; at least, in so far as the contract impairs the right of the public to hold the lessor answerable for the proper discharge of the duties it assumed in consideration of the powers granted to it by the sovereignty. [Railroad v. Brown, 17 Wall. 445; Thomas v. Railroad, 101 U. S. 71; Chollette v. Railroad, 26 Neb. 159, 4 L. R. A. 135; Muntz v. Railroad, 64 L. R. A. 222.]

"Before going into a discussion of the question on principle, it is well to classify the adjudications, so that those directly in point may be studied more readily, and those wherein the proposition affirmed is not iden-

tical with the one involved here, may have attached to them the value they merit as containing the lucubrations of judges on the general question, and not treated as precedents on the exact question before us.    When the lease is authorized by statute, the leasing company, of course, remains liable for the acts of the lessee if the statute says it shall.    [Smith v. Railroad, 61 Mo. 17; Markey v. Railroad, 185 Mo. 348; Main v. Railroad, 18 Mo. App. 388; Brown v. Railroad, 27 Mo. App. 396; McCoy v. Railroad, 36 Mo. App. 445; Quested v. Railroad, 127 Mass. 204; Daniels v. Hart, 118 Mass. 543; Bower v. Railroad, 42 Ia. 546; Whitney v. Railroad, 44 Maine 362; Stearns v. Railroad, 46 Maine 95.] When the statute authorizes the leasing, but says nothing as to whether the lessor shall remain liable, a few courts hold that nevertheless the lessor is liable as fully as the lessee itself would be for the latter's tortious acts; and, in pursuance of this extreme view, these courts have held the leasing company liable for negligent injuries inflicted by the lessee on its own servants. [Railroad v. Hart, 209 Ill. 414; Logan v. Railroad, 116 N. C. 940; Harden v. Railroad, 129 N. C. 354; Singleton v. Railroad, 70 Ga. 464; Bank v. Railroad, 25 S. C. 216; Hart v. Railroad, 33 S. C. 427.] In the case last cited the court went so far as to hold the lessor liable in punitive damages for the wrongful conduct of the lessee. The doctrine of other tribunals is that the leasing company remains liable to third persons for an injury received because of the improper construction or bad repair of the roadbed, station houses, or other real property, on the ground that it was the peremptory duty of the lessor to maintain its properties in good condition for the use of the general public, including as part of the public the servants of the leasing company.    [Lee v. Railroad, 116 Cal. 97, 58 Am. St. Rep. 140.]    In certain cases which maintain the doctrine that the lessor is not exonerated by a statutory lease from responsi-

bility for the wrong performance by the lessee of any charter power or duty, it is held that the safe operation of cars and trains on which passengers are carried is a charter duty. [Railroad v. Culberson, 72 Tex. 375.] We have found no Missouri statute, either relating to the chartering of companies, or to their regulation, which undertakes to impose on street car companies by special legislative enactment the duty of careful operation of cars for the security of passengers, though such companies are under a common law duty of that sort. There are cases wherein the general principle that the leasing company remains responsible for the proper performance of its charter duties is adhered to, but the operation of trains and cars is declared not to be one of those duties. [Mahoney v. Railroad, 63 Maine 68.] And see note to Railroad v. Dunbar, 71 Am. Dec. 291, wherein, on page 297, it is said that a case holding the contrary does not accord with sound principle or authority. Other decisions repudiate these various distinctions as of no importance and ground the non-liability of the lessor on the grant of statutory power to make a lease; holding that this imports a lease with all the usual incidents and consequences of that sort of a contract, one of which is that if the property is in safe and good condition when turned over to the lessee, the lessor is not responsible for subsequent injuries arising from its bad repair. [Fisher v. Railroad, 34 Hun 433; Miller v. Railroad, 125 N. Y. 118.]

"The foregoing cases may be classified, too, with reference to the principles on which they hold the leasing company responsible. Some courts profess to do this because public policy requires it, but disagree as to what particular public policy is to be subserved by the rule. Some ground the responsibility, as we have seen, on the fact that a railway company is an artificial person, deriving its powers from the sovereignty, and

in consideration of those powers agreeing to perform certain duties for the sovereignty; hence should be held strictly accountable for their proper performance. Other cases declare that charter duties cannot be transferred, and that it is a charter duty to carry passengers safely. Others, that neither charter nor common law duties can be transferred to a lessee so as to shift responsibility from the lessor; and that if the safe carriage of passengers is not a charter duty of the leasing company, it is at least a common law duty for the due performance of which the company that owns the railway is answerable.

"Much stress is laid in some decisions on the supposed fact that if one railway company is permitted to lease its property to another, and thereby relieve itself from liability for the lessee's torts, leases may be made to irresponsible companies and the public left remediless. [Harden v. Railroad, 129 N. C. 354.] There is one case—perhaps there may be others—which held the lessor responsible, apparently, on the ground that the lease did not transfer every franchise possessed by the lessor. [Braslin v. Railroad, 145 Mass. 64.] Still other cases hold the lessor responsible because, by the terms of the lease, it retains control of the management and operation of the leased property. [Driscoll v. Railroad, 65 Conn. 230.]

"It will be seen from the foregoing analysis that there is a wide divergence of opinion among courts holding the leasing railway company liable for the misfeasance of the lessee, both as to the extent of the liability (i. e., what instances of tortious conduct it covers) and the principles on which it is founded. A more direct reference to some of the cases may aid in elucidating the doctrines held and the sources whence they are derived. The Illinois cases run back to Railroad v. Dunbar, 20 Ill. 623, in which a leasing railway company was held answerable for breach of a contract by

203 Sup—11

the lessee to carry freight. The point came up on demurrer to a plea of the lease by way of defense. No statute authorizing such a lease was in force at the time and the contract was held to be *ultra vires*. In later cases, after such a lease had been authorized by statute, the Supreme Court of Illinois founded the liability of the lessor at first on the theory that the lessee was its agent for the operation of the railway. [West v. Railroad, 63 Ill. 545.] Afterwards, this theory was discarded as unsound, and the notion adopted that public policy forbade the leasing, because an insolvent lessee could be selected and all responsibility to the public evaded by the company to whom the State had granted franchises. [Railroad v. Hart, 209 Ill. 414.] The North Carolina cases are traceable to Aycock v. Railroad, 89 N. C. 321, wherein a company which had permitted another company to run trains over its track, was made to pay for damage done by fire communicated to adjacent farms, from rubbish permitted to accumulate on the right of way and ignited by sparks from an engine having no spark arrester. There was no lease and it did not appear that the defendant was not actually operating trains on its road. [See dissenting opinion in Harden v. Railroad, 129 N. C. 354.] The Massachusetts case of Braslin v. Railroad, supra, lays stress on the facts that only a portion of the railroad of the lessor company was leased; that said company was not going out of business and that indemnity was taken by it for the acts of the lessee, thereby showing that both parties understood defendant was not to be released by the contract from the discharge of its public duties. The Georgia cases begin with Singleton v. Railroad, 70 Ga. 464, in which the defendant permitted its lessee to do business in its name, and in its name sell plaintiff the ticket on which he was traveling when hurt by the negligence of the lessee. It is apparent that though this was a case of leasing, the defendant

lessor was responsible, because it had permitted the lessee to hold defendant out as the principal in making contracts with the public and particularly with the plaintiff. In the Kentucky case of McCabe's Admrx. v. Railroad, 112 Ky. 861, we gather from the opinion that the Constitution of the State retained the liability to the public of the original company in the event of a lease or other transfer of its properties. In Muntz v. Railroad, 64 L. R. A. 222, the opinion leaves one in doubt as to whether the lessor was held responsible because there was no legislative authority for the lease or because all the franchises and property of the leasing company were not transferred, or from motives of public policy. In the Driscoll case (65 Conn. 230), the lessee agreed to indemnify the lessor, not only against costs, charges and expenses in the management of the leased property, as was done in the case at bar, but also against damages incurred in the operation of the property; and, moreover, it was agreed that the superintendent of the lessee, who was given power to hire employees, must be satisfactory to the lessor. Two judges dissented in that case. The majority opinion said the sole question was whether or not the defendant (lessor) had transferred the property to the lessee. In Lee v. Railroad, 116 Cal. 97, a brakeman was hurt because of bad rails and roadbed. The Constitution of the State contained a clause inhibiting the release of the property of a lessor from liability for damage incurred in the construction and operation of the road; but the case was decided against the defendant on the ground that, in the absence of an express statutory exemption, it remained liable, notwithstanding the lease, for the proper construction of the road, station houses, etc. The opinion approves the doctrine of Railroad v. Curl, 28 Kan. 622, which holds a leasing company liable for the omission of a duty in the construction of the road, but exonerates it from responsibility for torts in

the handling of trains and the management of the road. The Kansas opinion was prepared by Justice BREWER, now of the Supreme Court of the United States, and indorsed the New York decisions concerning the liability of lessors for injuries due to defects in leased property, citing Swords. v. Edgar, 59 N. Y. 28, and Ditchett v. Railroad, 67 N. Y. 425. In Railroad v. Morris, 68 Tex. 49, there was no statutory authority for the lease. The South Carolina cases most strongly support the plaintiff's position, whereas the Massachusetts cases can hardly be said to lend it any support. Opinions holding the lessor liable for the torts of the lessee, when the leasing is authorized by statute, leave the impression that the courts lay hold of various general rules of corporation law, having very remote bearing on the immediate question, in order to enforce what the deciding tribunal happens to think would be a salutary rule. Much stress is laid on the fact that the corporation is an artificial, instead of a natural, person, and derives its powers from the State. How this dogma can restrict the right of a railway company to lease its property, when the statute gives the right in unqualified terms, is not easy to perceive. The proposition that a railway company is bound to perform all its charter duties, and all its primary duties to the public, whether imposed by the charter or the common law, is sound. But the proposition that the Legislature may authorize it to transfer to any other company by lease the performance of those duties is equally sound. The mischief which it is supposed would result if leasing railway companies are not held responsible for torts, in that leases to irresponsible companies would be made for the purpose of evading liabilities, is met by two answers: first, if that was the intention, on proof of the fact, the lease would be disregarded like any other fraudulent conveyance, and the lessor held responsible; second, our statutes require one-half of the

capital stock of a street railway company to be sub-
scribed and ten per cent of the subscriptions to be paid
up in cash; and to that extent, at least, a lessee com-
pany would have to start with assets. [R. S. 1899, sec.
1186.] In the case at bar, the capital stock of the Tran-
sit Company was $20,000,000, and it must have had
$1,000,000 of paid-up capital when organized.

"The policy of the State in regard to such con-
tracts was settled by the Legislature when it authorized
the leasing of the property of one street railway com-
pany to another. The policy is, of course, to permit
such leases; for the very highest evidence of the public
policy of any State is its statutory law. But it is said
that the true public purpose is to permit the lease, but
hold the leasing company answerable for the torts of
the lessee. Inasmuch as there is legislation on the sub-
ject, the policy of the State must, as said, be derived
from the enacted laws. If it appears on a fair inter-
pretation of the statutes authorizing the leasing that
the Legislature contemplated a continuance of the lia-
bility of the lessor, the law should be so declared; but
if it appears that the Legislature did not construe this
liability against the leasing company, but authorized
leases of street railway properties with all the legal
effects pertaining to lease contracts at common law,
then the courts have no right to partially annul the leg-
islative intention, or engraft on the law an exception
in the interest of what they believe would be good pol-
icy. This whole question is not one of public policy at
all, but of legislative intention—of statutory construc-
tion. The public policy notion misconceives and misses
the essential inquiry. We have a statute broadly au-
thorizing contracts like the one before us, and the pri-
mary inquiry is whether or not the statute discloses
an intention on the part of the Legislature to hold a
leasing railway company responsible for torts after
the lease is executed and the property transferred.

The first rule for the interpretation of statutes is that their meaning must be collected, if possible, from the language used. Of course, if a certain interpretation would lead to absurd or iniquitous results, it will not be adopted unless compelled by the language. [Bowers v. Smith, 111 Mo. 45; Fosburgh v. Rogers, 114 Mo. 122; Lamar Co. v. Lamar, 128 Mo. 188.] We may allow, therefore, that the court may take into consideration what it believes would be for the common weal to this extent, namely, that, if one construction would be mischievous and another beneficial, and the language of the enactment permits either to be adopted, the salutary one will be preferred. The statute with which we are dealing, after enumerating other powers of street railway companies organized under the law, provides:

" 'Seventh. To purchase, lease, or acquire by other lawful contract, which shall include the right to purchase the capital stock and bonds of other street railroad companies, and to hold and dispose of the same, and to hold, use and operate any street railroad or roads, with all and singular its or their franchises and properties of every description belonging to any other street railroad corporation or corporations: Provided, that such purchase, lease or other contract be authorized or approved by the vote of the holders of two-thirds in amount of the capital stock of the company so purchasing, leasing or otherwise contracting therefor at a meeting called for that purpose upon twenty days' notice published in some newspaper of the city or county where the general office of such street railroad company may be located, or by written notice mailed to the last known address of each registered stockholder twenty days before such meeting; and provided further, such roads connect with or intersect each other, so as to allow a single passage one way over each road for a single fare.

" 'Eighth.   To sell, lease or dispose of by any other lawful contract, to any other street railroad company, its railroad rights, franchises, including the right to be a corporation, and all and singular its other properties of every character and description:   Provided, that such sale, lease or other contract disposing of its railroad, franchises and other properties, shall be first authorized or approved by the vote of two-thirds in amount of the holders of its capital stock at a regular or called meeting of its stockholders convened pursuant to such notice as is required in the next preceding clause.'   [R. S. 1899, sec. 1187.]

"It will be seen that the statute authorizes any railway company to purchase, lease or acquire by other lawful contract, all the franchises and property of every description belonging to any other street railway corporation, including the stock and bonds of the latter, and further authorizes the purchasing or leasing company to hold, use and operate the railway leased. The statute further authorizes any street railway company to sell, lease or dispose of by any other lawful contract, to another company, its railroad rights and franchises, including the right to be a corporation, and all and singular its other properties of every description. We remark emphatically, that as the Legislature granted street railway companies power to dispose of their franchise to be a corporation, it could never have been the intention to hold such companies responsible for the acts of a company acquiring the franchises.   When a company disposes of its right to be a corporation, it practically passes out of existence, and cannot be held responsible in any legal method which occurs to us. Moreover, a company is authorized by said lease or other lawful contract, to dispose of all its property, which shows that the lawmaking body did not expect it to still stand responsible for the acts of the vendee; for how could it be held responsible after all its prop-

erty was gone? But it is argued that those provisions take effect only in the case of sales. The words of the statute are "to sell, lease or dispose of by any other lawful contract." Take the instance of a lease for a long term of years, covering all the leasing company's property of every kind and character; in what way would it be practicable to collect judgments from such a company? It is true the reversion of the property might be sold under execution, but that would be of very little value to the purchaser if it was under an unexpired term longer than an ordinary lifetime. To our minds, it is palpable from the statute itself that the Legislature never thought of holding the leasing company answerable for the torts of the lessee. It fully intended to make the latter responsible; at least for all torts occurring in the operation of the road. Moreover, it is repugnant to every principle of law or justice to hold one person or company responsible for the negligence of another which it had no power to prevent. The statute empowers the lessee company to operate the road and unless the power of control is reserved by the lessor in the lease the operation will be without any interference by the lessor. Could the Legislature expect that in that contingency the lessor should stand answerable for negligent torts? To so hold would largely annihilate the privileges granted by the statute—would frustrate the purpose of the law-making body. That the lessee company is not responsible is a view strongly enforced by our statute in regard to the construction of laws; the first clause of which declares that "when technical words and phrases, having a peculiar and appropriate meaning in law are used in a statute, they shall be understood according to their technical import, unless that meaning is plainly repugnant to the intent of the Legislature, or of the context of the same statute." [R. S. 1899, sec. 4160.] Now, the word "lease" has a settled technical

import. It imports a contract by which one person, either natural or artificial, divests himself or itself of, and another person takes possession of, lands or chattels for a term. Certain immunities and responsibilities attach to every lease by the well-settled rules of law, unless there are covenants to the contrary. One of these incidents is that if the demised property is turned over to the lessee in good condition, the lessor is not afterwards liable for damages resulting from the negligent use of the property by the lessee. [Ward v. Fagin, 101 Mo. 669; Gordon v. Peltzer, 56 Mo. App. 599; Mancuso v. Kansas City, 74 Mo. App. 138.] According to the mandate of the statutes for the construction of laws, the word "lease" in the street railway statutes must receive its ordinary legal meaning, for there is nothing in the context repugnant to that meaning; but, on the other hand, all the contextual language points to the conclusion that the Legislature used the word in its usual sense. Hence, we hold that, in authorizing a street railway company to lease its property and authorizing the lessee to operate the property thus leased, the Legislature intended that the lessee should be answerable for the manner in which it used the property, and the lessor should not be.

"Furthermore, it happens that there have been other statutes enacted in this State authorizing a railway company to lease its property, in which the Legislature expressly provided for the retention of liability on the part of the lessor for the proper performance of the duties it owed the public. [McCoy v. Railroad, 36 Mo. App. 445.] The same court which decided the McCoy case stated, in Brown v. Railroad, 27 Mo. App. 394, 400, that railway companies cannot, "by a lease without the consent of the State, escape responsibility for the acts of the lessee . . . but with such consent it may undoubtedly do so," citing various cases, including Mahoney v. Railroad, 63 Me. 68. The opin-

ion then calls attention to the fact that, by section 790 of the Revised Statutes of 1879 (sec. 1060, R. S. 1899), it is provided that any railroad company in this State leasing its road to a corporation of another State, should remain liable just as if it operated the road itself. [See, too, Main v. Railroad, 18 Mo. App. 388.] In Markey v. Railroad, 185 Mo. 348, the liability of the leasing company was expressly reserved by the statutes, and hence the case is not in point as an authority on the question before us. But from it and other cases, and from the statutes themselves, we learn that the Legislature of this State has not omitted from enactments authorizing railway leases, clauses reserving liability against a leasing railway company for the torts of the lessee, when the purpose was to continue the responsibility of the former. Hence it is fair to presume that, when no reservation of liability was made in the act, either by express words or by implication, the intention was that the lessee alone should be answerable for its torts.

"That this interpretation of the statute is a sound one, is maintained by practically all the elementary treatises, and, in our judgment, by the weight of judicial opinion. The following cases are directly in point: Arrowsmith v. Railroad, 57 Fed. 165; Heron v. Railroad, 68 Minn. 542; Hayes v. Railroad, 74 Fed. 279; Caruthers v. Railroad, 44 L. R. A. 737; Mahoney v. Railroad, 63 Maine 69; Railroad v. Curl, 28 Kan. 622; Scziwak v. Railroad, 4 Pa. Dist. Ct. 339; Lakin v. Railroad, 13 Oregon 436; Gwathney v. Railroad, 12 Oh. St. 92; Railroad v. Mangum, 68 Tex. 342; Fisher v. Railroad, 34 Hun 433; Ditchett v. Railroad, 67 N. Y. 425; Mayor v. Railroad, 113 N. Y. 311; Miller v. Railroad, 125 N. Y. 118. The reasoning of these cases is, in the main, that when the Legislature by statute confers the authority on a railroad company to lease its properties and on another company to take and oper-

ate them, and pursuant to such statute, a lease is made
turning over all property in an unrestricted way to
the lessee, the proper view is that the Legislature in-
tended that all the ordinary incidents of a lease should
accompany the transaction and the lessor not remain
liable for operating torts.   In Pinkerton v. Railroad,
44 Atl. 284, the court said:

" 'The last point made by appellant is that, even
if the Pennsylvania Traction Company was incorpor-
ated, the lease to it by the Columbia & Donegal Rail-
way did not exonerate the latter from liability.   But
such a proposition is contrary to all the established
rules of law in regard to lessor and lessee.   The latter
steps into the place of the former, is substituted for
him, and assumes all subsequent liabilities incurred in
the operation of the property leased.   That is the very
ground on which it is held that a corporation cannot
lease or transfer any part of its franchises without ex-
press legislative or charter authority.   [Nelson v. Rail-
road, 26 Vt. 721.]   If a lease did not exonerate the
lessor, but left his liability unaffected, and only added
the liability of the lessee, no one could possibly be
hurt by it, or have any standing to complain.   It is
conceded that a franchise is a duty imposed, as well as
a privilege granted, by the State, and the duty cannot
be avoided or transferred to another without the
State's authority.   But when such authority is shown,
as in the act of 1887, to motor-power companies to
assume by lease the operation of passenger railway
companies, it must be construed as a grant, with all
the ordinary attributes of such authority between les-
sor and lessee, unless the statute or the contract makes
a reservation of continuing liability in the lessor.
Neither is alleged in the present case.   Neither Van
Steuben v. Railroad, 178 Pa. St. 367, 35 Atl. 992, nor
Hanlon v. Turnpike Co., 182 Pa. St. 115, 37 Atl. 943,
have any bearing on the present question.   In the for-

mer the lessee was a New Jersey company, and it was held that the statute authorizing railroads to lease their lines did not extend to a foreign corporation, and in the latter it was said that there was no evidence of authority to make the lease. The remarks on this subject must, therefore, be taken as applied to the state of facts then before the court. In other States there is some conflict in the cases, and there is some difference of opinion among the text-writers as to the weight of authority. But, as is well said in 5 Thompson on Corp., sec. 5884 n, after stating the admitted rule that, if the lease is not valid, there is a continuing liability of the lessor: "Some of the courts state the doctrine loosely, without any apparent regard to the question whether the lease was lawful or unlawful. . . . But, by running back through the decisions of these courts on the subject, it will generally be found that in the first case stating the doctrine stress was laid on the fact that the Legislature had not authorized the railroad company to assign its franchises, or devolve its public duties upon another person or corporation." This points out clearly the source of most of the conflict in the cases. Two of them are specially relied on by appellant, and were cited in Hanlon v. Turnpike Co., supra; Nelson v. Railroad, 26 Vt. 717, and Railroad v. Brown, 84 U. S. 445. In the former it nowhere appears that the lease was authorized by law, and in the latter the railroad was operated jointly by the lessee and the receiver of the lessor, and the passage ticket which was the basis of the action was issued in the name of the lessor company. On the general subject, see Booth on St. Ry. Law, sec. 425; Pierce on Railroads, 283; Patt., Ry. Acc. Law, secs. 130, 131; 19 Am. and Eng. Ency. Law, 891, note. After consideration of both views, we are of opinion that the settled principles of law and the decided weight of authority are in favor

of the rule that, where a lease is duly authorized by law, there is no further liability of the lessor for negligence of the lessee in the operation of the road.'

"In the Heron case, 68 Minn. 542, it is said that in enacting a statute authorizing the lease without retaining the liability of the lessor, the Legislature impliedly relieved it from liability. The same doctrine is maintained in the Caruthers case, decided by the Supreme Court of Kansas, and in most of the other cases cited above. The New York courts hold that an unrestricted lease of a railway, made pursuant to a statute which confers on the lessee the right to take and operate the property, stands like any other case of leasing, and that if the lessor turns the property over to the lessee without any reservation of control, the latter alone is responsible for the negligent use of it. In the following text-books, the doctrine that the lessor ceases to be responsible, is maintained: 2 Elliott, Railroads, sec. 469; Hutchinson, Carriers (2 Ed.), sec. 515; Pierce, Railroad Acc. Law, secs. 130, 131; Booth, St. Ry. Law, sec. 425; 5 Thompson, Corporations, sec. 588; Nellis, Surface Railroads, p. 266, sec. 16; Nellis, St. Ry. Acc. Law, p. 488, sec. 6; Noyes, Intercorporate Relations, sec. 219, particularly page 316. See, also, comments made by Judge REDFIELD in his work on Railways on the decision of Nelson v. Railroad, 26 Vt. 721. In commenting, he says that the effect of legislative consent to the lease was not met or decided in the Nelson case. [Redfield, Railways, p. 618, note.]

"Of course, those commentators recognize the division of judicial authority on the question; but every one of them gives his voice in favor of the soundness, on principle, of the proposition that the leasing company is not responsible for damage entailed by the negligence of the lessee in the operation of the road when the leasing is done under statutory authority. Plaintiff's injury was not caused by a bad roadbed, or by

anything but the carelessness of the crew of the car on which she was riding; that is, the carelessness of the Transit Company's employees, whom the United Railways Company had not the least opportunity to control. Therefore, for the foregoing reasons, we think the judgment in favor of the United Railways Company, on the present record, was for the right party and should be affirmed.

"Of course, if evidence was adduced to show that it was contemplated from the first by the incorporation of the two companies that the property should be leased to the Transit Company in order to accomplish a fraudulent purpose, and that the alleged lease was a sham; or any other fact was proved to show it was not made in good faith, but to protect the United Railways Company from debts and judgments, a very different proposition would be presented for decision. The essential fact to be shown to overthrow the lease is that it was not bona fide, but colorable—was a fraudulent conveyance. This, however, is purely a question of fact to be established by relevant evidence in the bill of exceptions touching such issue. The proposition squarely asserted is that the United Railways Company is responsible, as a matter of law, for the injuries of the plaintiff, even if its contract with the Transit Company was a lease in legal effect and executed with an honest purpose. We do not assent to that proposition, but think the liability of the Railways Company depends on facts *in pais*, and cannot be established by construing the writing purporting to be a lease."

In our judgment there is no conflict between the opinion of GOODE, J., supra, and the opinion of this court in the cause of Markey v. Railroad, 185 Mo. 348. The Markey case was grounded upon the statute of this State, which authorized domestic railway companies to lease their roads to foreign railway companies.

but which statute expressly provides that the lessor should remain liable. Such is not the case at bar, and such is not the statute under review. The Markey case, supra, in no way conflicts with the views of the law expressed by Goode, J., supra.

We therefore affirm the judgment of the circuit court. All concur.